IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARDS AND ANDERSON, INC., | Case No.  25-cv-00882-MMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION** |
| PENINSULA PETROLEUM, LLC, | |
| Defendant. | |

Before the Court is Peninsula Petroleum, LLC's ("Peninsula") "Motion for Summary Adjudication," filed January 13, 2026. Plaintiff Edwards and Anderson, Inc. ("E&A") has filed opposition, to which defendant has replied.

The matter came on regularly for hearing on June 26, 2026. Colin C. West and Nicholas B. Pfeiffer of Morgan, Lewis & Bockius LLP appeared on behalf of defendant. Kenneth P. Roberts of K.P. Roberts & Associates, APLC, appeared on behalf of plaintiff.

The Court, having considered the parties' respective written submissions and the arguments of counsel made at the hearing, hereby rules as follows.

## BACKGROUND[1]

In 2001, Peninsula began operating Shell-brand gas stations in California, Oregon, and Washington. (See Doc. No. 65-8 ("Castelo Decl.") ¶¶ 5, 6.) For most of its gas stations, Peninsula owned the properties on which the stations were located and operated the stations as the retailer. (See id. ¶ 8.) For a few stations, however,

---

[1] The following facts are undisputed.

"Peninsula owned but did not operate the gas retail station," and, instead, "entered into (1) retail sales agreements ('RSAs') with independent retail operators for the use of the Shell trademark and supply of Shell fuel and (2) retail facility leases ('Leases') with those retail operators for the stations' premises." (See id. ¶ 9.) Three such stations, located in Salinas, California ("Salinas Station"), Seaside, California ("Seaside Station"), and Freedom, California ("Freedom Station") (collectively, "E&A Stations" or "Stations"), were leased and operated by E&A. (See id. ¶ 10.)

On January 1, 2022, Peninsula and E&A signed RSAs and three-year leases for the Salinas and Seaside Stations (see id. ¶¶ 11, 14), with an expiration date of December 31, 2024 (see id. ¶¶ 11, 13, 14, 15), and, on January 1, 2023, signed an RSA and a three-year lease for the Freedom Station (see id. ¶ 16), with an expiration date of December 31, 2025 (see id. ¶¶ 16, 18).

In November 2023, Peninsula entered into a purchase and sale agreement with Hasco Distribution, LLC ("H&S") for the sale of all its assets, namely, gas station properties, fuel supply agreements, and lease agreements. (See Doc. No. 85-6 ("Roberts Decl.") Ex. A at 165:1-8; 172:9-13.) On March 19, 2024, however, Peninsula and H&S entered into a "Use Covenant" agreement regarding each of the properties on which the three E&A Stations were located. (See Roberts Decl. Ex. C.) Under the Use Covenant agreement, Peninsula retained ownership of the properties on which the three Stations were located as well as the lease agreements with E&A, but assigned the RSAs for the three E&A Stations to H&S, by which assignment H&S sold Shell fuel to E&A and authorized E&A to use the Shell trademark. (See Castelo Decl. ¶ 19.) Peninsula, by retaining the lease agreements, remained E&A's landlord with respect to the three E&A Stations. (See id.)

The Use Covenant contained a number of other provisions, two of which are relevant here. First, it provided that H&S "shall have the right to object to [Peninsula's] determination of the Fair Market Rental Rate"[2] for the E&A Stations. (See Roberts Decl. Ex. C ¶ 3.b.) If H&S objected to the rent amounts offered by Peninsula, H&S and Peninsula had to "meet and attempt to agree upon" the rent amounts, and, if they were "unable to agree," the rent would be set by a third-party appraiser. (See id. ¶¶ 3.b.-3.c.) Second, it required that, in the event the leases for the E&A Stations were "terminated for any reasons other than a termination of the RSA as a result of a default under the RSA by [H&S]," Peninsula "shall be required to sell and [H&S]…shall purchase" the Stations at pre-determined purchase prices. (See id. ¶ 4.)

On December 4, 2024, prior to the expiration of the leases for the Salinas and Seaside Stations, Peninsula's counsel, Henry Wineman, sent proposed renewal leases to E&A's President, Carol Anderson, for a term of one year. (See Doc. No. 65-2 ("Wineman Decl.") ¶ 4; see also Castelo Decl. Exs. G, H.) On December 20, 2024, E&A's counsel, Ken Roberts, advised Wineman via email that, in E&A's view, Peninsula's transfer of the RSAs to H&S constituted a withdrawal by Peninsula from the marketing of motor fuel in the relevant geographic market, that such withdrawal, in turn, resulted in a termination of the franchise under the Petroleum Marketing Practices Act ("PMPA"), and, consequently, that Peninsula was obligated under the PMPA to make a bona fide offer to sell the Salinas and Seaside Stations to E&A. (See Wineman Decl. Ex. C at 3.) Roberts also

---

[2] "Fair Market Rental Rate," as defined in the Use Covenant, "mean[s] the rent at which third-party tenants in an arms-length transaction…will be leasing" a comparable property for a comparable term. (See Use Covenant § 3.a.)

stated, however, that E&A would consider offers for leases longer than one year. (See id.)

On January 8, 2025, Peninsula provided E&A with a revised renewal lease offer, namely, "a 4-year lease extension" for the Salinas and Seaside Stations, from January 1, 2025, through December 31, 2028, "and a three year lease extension" for the Freedom Staton, from January 1, 2026, through December 31, 2028. (See Roberts Decl. Ex. B at 1.) The parties, failed, however, to reach agreement on lease renewals for the Salinas and Seaside Stations (see Wineman Decl. ¶¶ 8-10; see also Castelo Decl. ¶ 30), and, on February 13, 2025, Peninsula gave E&A formal notice that it would not renew the leases for the Salinas and Seaside Stations (see Wineman Decl. ¶ 12).

On September 2, 2025, prior to the Freedom Station lease's scheduled expiration date of December 31, 2025, Wineman sent Roberts a proposed renewal lease for the Freedom Station. (See id. ¶ 14.) The parties failed to reach agreement on said proposal, and Peninsula, on October 2, 2025, gave E&A formal notice that it would not renew the lease for the Freedom Station. (See id. ¶ 16.)

Based on the above events, E&A filed the instant action, and in the operative complaint, the Third Amended Complaint (see Doc. No. 60 ("TAC"), asserts the following three Causes of Action: (1) "Wrongful Termination and Non-Renewal of Franchise/Lease and Lease Relationship Without Providing Notice [under PMPA]" (see id. ¶¶ 26-35); (2) "Wrongful Non-Renewal of PMPA Franchise Regarding the Freedom Station" (see id. ¶¶ 36-49); and (3) "Breach of Contract and Conversion" (see id. ¶¶ 50-58).

The First Cause of Action alleges (1) Peninsula's written notice of termination or non-renewal of the franchise failed to comport with the notification requirements set forth in 15 U.S.C. § 2804 for such written notice (see id. ¶ 27); (2) Peninsula, by having assigned the RSAs to H&S, withdrew from the California fuel supply market, and thereby

4

United States District Court
Northern District of California

"terminated and nonrenewed franchise agreements between Peninsula and E&A and the franchise relationship" (see id. ¶ 28); and (3) "Peninsula failed to make the required bona fide offer to sell the leased marketing premises to E&A upon market withdrawal" (see id. ¶ 31). The Second Cause of Action concerns the Freedom Station and similarly alleges that Peninsula's written notice of non-renewal did not satisfy the requirements of 15 U.S.C. § 2804 (see id. ¶ 45) and that Peninsula withdrew from the California market without having made a bona fide offer to sell the station to E&A (see id. ¶¶ 46-47). The Third Cause of Action alleges Peninsula breached its lease agreement as to the Freedom Station by failing to "maintain[] the fueling systems" (see id. ¶ 53), resulting in "contaminat[ed]" fuel, and, in turn, "lost sales" (see id. ¶¶ 54, 55).

By the instant motion, Peninsula moves for summary adjudication as to E&A's First and Second Causes of Action on the grounds that (1) "E&A cannot establish a termination or nonrenewal at the time of assignment of the [RSAs]"; (2) "Peninsula had grounds under the PMPA to elect not to renew the [l]eases, and provided proper notice"; and (3) "E&A was not entitled to a bona fide offer of sale of the [p]remises." (See Doc. No. 65 ("Mot.") at 2:11-19.)[3]

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric

---

[3] E&A's Third Cause of Action for breach of contract and conversion is not at issue in the instant motion.

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  See Celotex, 477 U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).  "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion."  See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

### DISCUSSION

**I.     Whether Peninsula's Notices of Non-Renewal Were Adequate**

In its First and Second Causes of Action, E&A alleges Peninsula's written notice of non-renewal for the three E&A Stations failed to satisfy the notification requirements of 15 U.S.C. § 2804. (See TAC ¶¶ 27, 45.)

Under the PMPA, a franchisor, in order to "fail to renew any franchise relationship," must comply with specified "notification requirements." See 15 U.S.C. § 2802(b)(1)(A). Such notification must be "in writing" and "posted by certified mail or personally delivered to the franchisee," and must contain (1) "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefore"; (2) "the date on which such termination or nonrenewal takes effect"; and (3) a "summary statement prepared" by the Secretary of Energy regarding "the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee." See 15 U.S.C. § 2804(c)(3); § 2804(d)(1).

United States District Court
Northern District of California

United States District Court
Northern District of California

Here, the parties do not dispute that Peninsula sent essentially identical notices of non-renewal to E&A for the Salinas and Seaside Stations on February 13, 2025 (see Doc. No. 85-1 ("Anderson Decl.") Ex. D; see also Wineman Decl. ¶ 12) and the Freedom Station on October 2, 2025 (see Castelo Decl. Ex. K);[4] that such notices were sent in writing and by certified mail (see id. Wineman Decl. ¶¶ 12, 16; see also Anderson Decl. ¶ 7); and that the notices contained the requisite PMPA summary statement by the Secretary of Energy (see Anderson Decl. Ex. D at 4-8; see also Costelo Decl. Ex. K at 5-9).

E&A contends, however, that Peninsula's non-renewal notices were "fatally defective" because they did "not refer to the provision of the PMPA now sought to be relied upon and did not even state or suggest that it was being given pursuant to the PMPA" (see Doc. No. 85 ("Opp.") at 20:8-11); according to E&A, the PMPA requires the notice of non-renewal to expressly cite to "which section of the PMPA provides the grounds for termination or non-renewal" (see id. at 19:1-2) (internal quotation, citation, and emphasis omitted).

The PMPA "limits the circumstances in which petroleum franchisors may 'terminate' a franchise or 'fail to renew' a franchise relationship," see Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC, 559 U.S. 175, 177 (quoting 15 U.S.C. § 2802), and,

---

[4] Although Peninsula's notice of non-renewal for the Freedom Station was sent to E&A's counsel, whereas the notices for the Salinas and Seaside Stations were sent directly to E&A, the Court finds the delivery to counsel constituted substantial compliance with § 2804(c)(2)'s requirement that the notice be "delivered to the franchisee." See, e.g., Brown v. Magness Co., Inc., 617 F.Supp. 571, 574 (S.D. Tex. 1985) (holding "defendant's delivery of the notice to the plaintiff's attorney, and not to plaintiff personally, [did not] make such notice defective"; noting "[a]lthough the notice requirement, 15 U.S.C. § 2804, must be strictly followed,…the statute does not contemplate an elevation of form over substance where plaintiff has not been deprived of actual notification") (internal quotation and citation omitted).

United States District Court
Northern District of California

consequently, "requires that a franchisor's notice of nonrenewal state the 'reasons' for nonrenewal," see Svela v. Union Oil Co. of California, 807 F.2d 1494, 1498 (9th Cir. 1987). "The reasons must…be specific enough for the franchisee to determine whether nonrenewal rests on lawful grounds." Id.

Here, Peninsula, in its non-renewal notices, stated it was providing "formal notification" that it was not renewing the leases, the specified reason being "because [of] the failure of [Peninsula's] good faith efforts to renew the [l]eases upon the expiration," and E&A's "failure to agree to the terms of renewed lease agreements, which were offered in good faith and in the normal course of business." (See Anderson Decl. Ex. D at 2.)

The failure to agree to terms offered in good faith and in the normal course of business is a ground for non-renewal covered by the PMPA, namely, § 2802(b)(3)(A), and the notice of non-renewal need not expressly cite § 2802(b)(3)(A) or even "track the language" of said subsection so long as the substance of the notice shows the franchisor "relied on" § 2802(b)(3)(A) by making "clear that the failure to agree to [the franchisor's] new franchise terms" was the cause of the non-renewal. See Svela, 807 F.2d at 1499-1500.

In this instance, each of Peninsula's non-renewal notices actually "track[s] the language" of § 2802(b)(3)(A), see id. at 1500, in that each states such non-renewal is due to E&A's failure to agree to lease terms "offered in good faith and in the normal course of business" (see Anderson Decl. Ex. D at 2); see also § 2802(b)(3)(A), and, consequently, the notice is "specific enough for [E&A] to determine whether nonrenewal rests on lawful grounds," see Svela, 807 F.2d at 1498.[5]

---

[5] Although, as E&A points out, Peninsula stated in the non-renewal notices that it

8

Accordingly, as to all three E&A Stations, Peninsula has shown there is no triable issue as to whether it satisfied the notification requirements of § 2804.

**II.    Whether Peninsula's Assignment of the RSAs to H&S Terminated the Franchise Relationship Between Peninsula and E&A**

In its First and Second Causes of Action, E&A alleges Peninsula, by assigning the RSAs to H&S on March 19, 2024, while retaining the lease agreements for the E&A Stations, "terminated" the franchise between Peninsula and E&A under the PMPA. (See TAC ¶¶ 15, 42.)

Under the PMPA, "[a] franchise is defined in terms of three elements: [1] a contract to use the refiner's trademark, [2] a contract for supply of motor fuel to be sold under the trademark, and [3] a lease of the premises at which the motor fuel is sold." See Fresher v. Shell Oil Co., 846 F.2d 45, 46-47 (9th Cir. 1988). A "termination" of a franchise occurs only when a franchise is "put to an end or annulled or destroyed." See Mac's Shell Service, 559 U.S. at 183 (internal quotations and alteration omitted). Consequently, a "franchisee who continues operating a franchise—occupying the same premises, receiving the same fuel, and using the same trademark—has not had the franchise terminated." See id. at 183-84 (internal quotation and alteration omitted).

Here, E&A contends, Peninsula, upon its assignment of the RSAs to H&S, was no longer a "franchisor" under the PMPA and that the franchise "ceased," because "Peninsula was not the supplier of fuel and did not authorize use of the brand" but only leased to E&A the properties on which the three Stations were located. (See Opp. at 22:9-16.)[6]

---

"do[es] not agree that the [PMPA] governs here" (see Anderson Decl. Ex. D at 3), Peninsula attached the Department of Energy's summary statement as required by § 2804, and, as noted above, tracked the language § 2802(b)(3)(A).

    [6] E&A does not contend an assignment by a franchisor of all three elements of a

As the Court has held on two prior occasions in these proceedings, however, the assignment of some, but not all, of the three elements does not constitute a "termination" under the PMPA, so long as the franchisee continues to occupy the same premises, receive the same fuel, and has the right to use the same trademark. See, e.g., Duncan Services, Inc. v. ExxonMobil Oil Corp., 722 F. Supp. 2d 640, 644-46 (D. Md. 2010) (holding where initial franchisor sold to one entity land leased to franchisee and assigned other elements of franchise to another entity, such transfers did not constitute "termination or non-renewal" of franchise where franchisee continued to rent same property, continued to receive same fuel, and continued to have permission to use same trademark); see also Poquez v. Suncor Holdings-COPII, LLC, 2011 WL 4351612, at *1, *4 (N.D. Cal. September 15, 2001) (holding franchisor's sale of leased property to third party did not "destroy[ ] the franchise" where plaintiff continued to use the premises to sell branded gasoline).

Here, E&A does not contend that, at any point after Peninsula's assignment of the RSAs to H&S, it no longer occupied the same premises, no longer received the same fuel, or lost the right to use the same trademark.

Accordingly, as to all three E&A Stations, Peninsula has shown there is no triable issue as to whether Peninsula's assignment of the RSAs but not the leases constituted a termination of the franchise under the PMPA.[7]

---

franchise to a single entity constitutes a termination under the PMPA.

[7] In light of such finding, E&A's argument that it was entitled to purchase "the leased marketing premises" (see TAC ¶ 31) fails. Although Peninsula, by its assignment of the RSAs, arguably made a "determination…to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area," see § 2802(b)(2)(E), a franchisee's right to purchase such property only pertains where the franchisor "terminate[s]…or…fail[s] to renew [the] franchise relationship," see § 2802(b)(1).

United States District Court
Northern District of California

### III.    Whether the Non-Renewal of the Leases Violated the PMPA

In its First and Second Causes of Action, E&A alleges Peninsula's "offer to renew did not comply with the PMPA." (See TAC ¶ 20.)

Under the PMPA, a franchisor "may fail to renew a franchise relationship at the conclusion of that term…if the franchisor…takes the action in question for a reason specifically recognized in the statute." See Mac's Shell Service, 559 U.S. at 178 (internal quotation and citation omitted). As discussed above, one such permitted ground for non-renewal under the PMPA is "[t]he failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise" if (1) "such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business" and, in addition, if (2) "such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship." See 15 U.S.C. § 2802(b)(3)(A).

The PMPA "was intended to provide franchisors with flexibility to respond to changing market conditions and consumer preferences." See Svela, 807 F.2d at 1501. In accordance therewith, § 2802(b)(3)(A) "contemplates the possibility of material changes in the terms of the franchise, allowing the franchisor to end the relationship if agreement cannot be reached with respect to such changes." See Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1391 (9th Cir. 1986) (holding "[t]he PMPA plainly contemplates that franchisors will have substantial flexibility in changing the terms of a franchise upon renewal"). Moreover, "renewal of the franchise relationship can be based on terms and conditions substantially different from those of the original franchise," see Svela, 807 F.2d

11

at 1500, and "[c]ourts have construed [§ 2802(b)(3)(A)] as precluding judicial second-guessing of the economic impact of an otherwise legitimate business decision by the franchisor," see Valentine, 789 F.2d at 1392 (internal quotation and citation omitted).

"Franchisors may not," however, "insist on arbitrary or pretextual franchise terms." See id. at 1391. "Any changes must be proposed by the franchisor on the basis of determinations made in good faith, in the normal course of business and not for the purpose of preventing renewal of the franchise relationship." Id. The "good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal," and "[u]nder [the normal course of business] test, the determination must have been the result of the franchisor's normal decisionmaking process." See id. at 1392 n.7 (internal quotations and citation omitted).

In evaluating whether a franchisor's actions were taken in good faith, "courts should look to the franchisor's intent rather than to the effect of his actions, making this a subjective test." See Svela, 807 F.2d at 1501. "So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith." Id. (internal quotation and citation omitted).

Here, E&A argues, the renewal leases proposed on December 4, 2024 were not offered "in good faith." (See Opp. at 13:23-24.) In particular, E&A contends, said proposals offered "exaggerated non-market rate rent" amounts "for the purpose of preventing the renewal of the franchise relationship," i.e., that Peninsula offered the rents "in the hopes that [E&A] would give up [its] station as too costly." (See id. at 13:24-14:13.)[8]

---

[8] Although E&A contends Peninsula had an incentive for E&A not to renew its

12

Peninsula, however, has submitted undisputed evidence that on December 4, 2024, it offered to renew the lease agreements for the Salinas and Seaside Stations, prior to their scheduled expiration date of December 31, 2024. (See Wineman Decl. ¶ 4; see also Castelo Decl. Exs. G, H.) Further, Peninsula has submitted undisputed evidence that, on January 8, 2025, after E&A informed Peninsula that, notwithstanding the position E&A was taking as to withdrawal and termination, E&A "would consider a long term lease" (see Wineman Decl. Ex. C at 3), Peninsula offered "a 4-year lease extension" for the Salinas and Seaside Stations and "a three year lease extension" for the Freedom Station (see Roberts Decl. Ex. B at 1).[9] Although, in response, E&A points to evidence that, despite having agreed with H&S to smaller rent increases than it was contemplating, Peninsula initially proposed lease renewals with the rent amounts to which H&S had objected (see Opp. at 13:5-27), there is undisputed evidence that, shortly thereafter, Peninsula, without any suggestion or complaint from E&A, revised its renewal lease terms to comport with the lower rents suggested by H&S (see Roberts Decl. Ex. B at 1).[10]

Given the undisputed evidence that Peninsula endeavored to meet the demands of both entities whose satisfaction with its proposed renewal terms was necessary for a

leases because the Use Covenant Agreement obligated H&S to purchase the three E&A Stations from Peninsula in the event the leases were terminated (see Opp. at 21:4-16), such argument is unavailing, as, even if the contract provision on which plaintiff relies applies to a non-renewal and not just a termination, said provision requires such purchase "[i]f the lease is terminated for any reason other than a termination of the RSA." (See Roberts Decl. Ex. C ¶ 4.) Consequently, if Peninsula in fact wanted to trigger said provision, it did not need to engage in what E&A describes as pretextual renewal negotiations.

[9] Peninsula has submitted undisputed evidence that the difference in lengths was "so all three [l]eases would expire simultaneously." (See Wineman Decl. ¶ 10.)

[10] While conceding he did not know "for sure" the reason for the higher rent initially proposed, Castelo "assume[d] it was an error." (See Doc. No. 88-1 ("West Decl.") Ex. B at 142:10-14.)

United States District Court
Northern District of California

continued lessor-lessee relationship,[11] rather than simply refusing to budge as to any of its initially proposed terms, and given that E&A has not pointed to any unfairness as to any of the terms ultimately offered to it, the Court finds Peninsula has shown there is no triable issue as to whether Peninsula acted in good faith in offering the renewal leases.

E&A next argues the proposed renewal leases were not offered in Peninsula's "normal course of business." First, E&A argues, H&S's contractual involvement in setting the rents for the three E&A Stations was not within the normal course of Peninsula's business in determining the rent amount it offered franchisees (see Opp. at 21:23-26), relying on a declaration submitted by M.J. Castelo ("Castelo"), a Peninsula executive, who described those contractual terms as "unusual," "unique," and "unconventional" (see Roberts Decl. Ex. A at 126:5-17). Irrespective of Castelo's opinion that the Use Covenant's allocation of certain rights to H&S was not in Peninsula's best interest, it is clear that such provision constituted a business decision on the part of Peninsula, and, moreover, one that worked to the advantage of E&A.

Second, E&A argues, Peninsula, in its lease renewal proposals, "pivoted away from the industry standard PMPA lease, to a commercial lease…analogous to what would be found in other non-petroleum, non-PMPA industries," and that "[s]uch a pivot…was a departure from Peninsula's ordinary course of business." (See Opp. at 7:11-16) (internal quotation and citation omitted), apparently interpreting "normal course of business" as "ordinary course of petroleum franchise business." The Court disagrees. Although Peninsula thought its assignment of the RSAs relieved it of any perceived

---

[11] As noted, pursuant to the Use Covenant, a continuation of Peninsula's leases with E&A was dependent on Peninsula's accepting the rent proposed either by H&S or a neutral third party. (See Roberts Decl. Ex. C ¶¶ 3.b.-3.c.)

obligation to make reference to the PMPA in its renewal leases with E&A, its decision to offer a traditional commercial lease was clearly made in the normal course of business. Moreover, Castelo testified that he "continued to operate the [E&A Stations'] leasing consistent with how [he] did it previously." (See Roberts Decl. Ex. A at 190:9-12). Other than noting the leases' lack of reference to the PMPA, plaintiffs offer no evidence to the contrary.

Accordingly, Peninsula has shown there is no triable issue as to whether its non-renewal of the leases violated the PMPA.

## CONCLUSION

For the reasons stated above, defendant's Motion for Summary Adjudication is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: July 8, 2026

MAXINE M. CHESNEY
United States District Judge